UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
CLAIR DOLLMAN and TREVOR DOLLMAN,    :

                     Plaintiffs,    :

      -against-    :

MAST INDUSTRIES, INC., VICTORIA'S    :
SECRET DIRECT, LLC, and LIMITED
BRANDS, INC.,    :

               Defendants.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

08 Civ. 10184 (WHP)

<u>MEMORANDUM & ORDER</u>

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 08/17/2010
```

WILLIAM H. PAULEY III, District Judge:

        Plaintiffs Clair Dollman ("Dollman") and Trevor Dollman bring this action

against Defendants Mast Industries, Inc. ("Mast"), Victoria's Secret Direct, LLC ("Victoria's

Secret"), and Limited Brands Inc. ("Limited") claiming employment discrimination, hostile work

environment, and wrongful termination on the basis of national origin or pregnancy in violation

of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 et seq., the

Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), and New York State and City Human

Rights Laws. Defendants move for summary judgment on all of Plaintiffs' claims. For the

following reasons, Defendants' motion is granted in part and denied in part.

BACKGROUND

        In May 2004, Victoria's Secret hired Dollman, a British citizen from the county

of Essex, England, to work as a Knit Fabric Manager in its New York office. (Defendants'

Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 dated Nov. 20, 2009 ("Defs.

-1-

56.1 Stmt.") ¶ 5; Affidavit of Clair Dollman in Opposition to Defendant's Motion for Summary Judgment dated Jan. 12, 2010 ("Dollman Aff.") ¶ 8.) Limited is a holding company for a number of subsidiary clothing and fabric businesses. (Defs. 56.1 Stmt. ¶ 1.) Victoria's Secret is a Limited subsidiary that sells women's clothing nationwide. (Defs. 56.1 Stmt. ¶ 2.) Mast, also a subsidiary of Limited, develops fabric for Victoria's Secret garments. (Defs. 56.1 Stmt. ¶ 3.)

As a Knit Fabric Manager, Dollman was responsible for the sourcing and technical development of fabrics used to produce goods sold in the Victoria's Secret catalog. (Defs. 56.1 Stmt. ¶ 5.) From May 2004 to November 2005, Dollman was supervised by and reported directly to Jaclyn Noble ("Noble"). (Defs. 56.1 Stmt. ¶ 7; Affidavit of Benjamin A. Shepler dated Nov. 20, 2009 ("Shepler Aff.") Ex. F: Affidavit of Jaclyn Noble dated Nov. 19, 2010 ("Noble Aff.") ¶ 3.) In November 2005, Noble was promoted and Alison Tranter ("Tranter") became Dollman's direct supervisor. (Noble Aff. ¶ 4.) Tranter, who is from Birmingham in West Midlands county, England, was Dollman's direct supervisor from November 2005 until Dollman's termination in February 2008. (Defs. 56.1 Stmt. ¶¶ 7-8, 14-15, 29-31.) Shortly after this change in supervision, Dollman was transferred from Victoria's Secret to a division of Mast known as "Victoria's Secret Direct Production," where she retained her position as Knit Fabric Manager. (Defs. 56.1 Stmt. ¶ 9.) In February 2007, she was transferred laterally from Knit Fabric Manager to Fabric Manager for Sleepwear/Swimwear/Color. (Defs. 56.1 Stmt. ¶ 10.)

Dollman concedes she was treated fairly while Noble was her direct supervisor. However, the parties offer sharply conflicting accounts about Dollman's performance under Tranter's management and about her relationship with Tranter. For her part, Dollman asserts

-2-

that she maintained an exemplary performance record and submits numerous letters of commendation and several internal company awards she received between 2004 and 2007. (Dollman Aff. Ex. B: Awards and Commendation Letters Bates Nos. 100-124, 584.)

Defendants submit that Dollman had a record of poor managerial and interpersonal skills. On May 18, 2006, Tranter gave Dollman a performance review. It included "several instances of non-positive feedback" under a category called "Rules of Engagement," which measured "respect," "positive intent," and the ability to "resolve conflict." (Noble Aff. Ex. A: Performance Review of Clair Warrick dated May 18, 2006 ("2006 Performance Review") at 5.) However, the evaluation concluded by indicating that Dollman met or exceeded expectations in every category. (2006 Performance Review at 6.) In August 2006, Noble and Tranter met with Dollman to discuss some ongoing performance issues, specifically her management skills and response to problems within her group. (Noble Aff. Ex. B: Meeting Notes dated Aug. 9, 2006.)

On April 13, 2007, Tranter gave Dollman another performance review which again indicated that she met or exceeded expectations in all categories. (Shepler Aff. Ex. A: Deposition of Clair Dollman dated June 25, 2009 ("Dollman Dep.") Ex. 16: Performance Review of Clair Warrick dated Apr. 13, 2007 ("2007 Performance Review") at 6-7.) Tranter noted on the review form that "Clair needs to partner with her peers & resolve conflict in a collaborative manner to avoid unnecessary tension escalating." (2007 Performance Review at 7.) In an October 2007 mid-year review, Tranter gave Dollman high marks for her technical work but also noted that she "blames others" and frequently "adopts a 'victim mentality.'" (Dollman Dep. Ex. 17: Mid Year Touchbase Review of Clair Dollman undated at 1-3.)

Dollman proffers that Tranter intensified her scrutiny by requiring her to attend weekly meetings when Noble had held only bi-weekly ones. (Dollman Aff. ¶ 9.) Tranter also instructed Dollman to refrain from using English jargon, such as "bonkers," or English humor with her colleagues. (Dollman Aff. ¶¶ 10, 12.) Dollman further sensed a "change in attitude" by Tranter, which she attributed to the fact that Tranter came from a different region of England than she did. (Dollman Aff. ¶¶ 8, 10, 12.)

On October 28, 2007, Dollman learned she was pregnant and scheduled an obstetrics appointment. (Dollman Aff. ¶ 13.) The next day, Dollman sent an email to Tranter requesting additional time off for another appointment, which Tranter approved with the proviso that Dollman try to schedule her appointments at the beginning or end of the day. (Defs. 56.1 Stmt. ¶ 33; Dollman Dep. Ex. 21: Series of Emails between Alison Tranter and Clair Dollman dated Oct. 29, 2007 ("Tranter-Dollman Emails").) After receiving Tranter's email, Dollman attempted to forward it to her husband, Trevor Dollman, but accidentally hit the "Reply" button and sent the following message to Tranter: "Look at this – little does she know! Ha Ha." (Tranter-Dollman Emails.) When Tranter inquired about this message, Dollman explained to Tranter and a human resources employee Melissa Jones ("Jones") that it was meant for her husband and was in reference to her pregnancy. (Dollman Dep. at 220-24.)

In November 2007, Tranter's mother visited the Mast office, approached Dollman to congratulate her on the pregnancy, and hugged her. (Dollman Dep. at 224-25.) Dollman believes that this was Tranter's attempt to embarrass her in front of her colleagues. (Dollman Dep. at 225.)

-4-

According to Defendants, in November 2007, a "business decision" was made to transfer certain sleepwear department responsibilities from Victoria's Secret Direct Production to another division of Mast. (Defs. 56.1 Stmt. ¶ 16; Shepler Aff. Ex. E: Affidavit of Mary Ellen Prentis dated Nov. 19, 2009 ("Prentis Aff.") ¶¶ 5-6.) This restructuring of Dollman's division resulted in the termination of two sleepwear associates. (Prentis Aff. ¶ 6.) Thereafter, Mary Ellen Prentis ("Prentis"), an Executive Vice President at Victoria's Secret, concluded that Victoria's Secret Direct Production no longer needed three Fabric Managers. (Prentis Aff. ¶¶ 8-9.) Prentis then assessed all three Fabric Managers "across a number of categories." (Prentis Aff. ¶ 10.) Based on this assessment, Prentis decided to terminate Dollman because "she was [sic] weakest by a considerable margin in the areas of customer service and leadership/managerial skills." (Prentis Aff. ¶ 11.)

On January 29, 2008, Mast informed Dollman of its decision, offered her a severance package, and allowed her to remain in her position until March 31, 2008. (Defs. 56.1 Stmt. ¶ 21.) The next day, Dollman informed Tranter that she would not come to work. (Defs. 56.1 Stmt. ¶ 22.) Without giving notice, she was also absent on January 31. (Defs. 56.1 Stmt. ¶ 22.) The next week, Dollman scheduled three appointments in three days—two with attorneys and one with a dentist. (Defs. 56.1 Stmt. ¶ 23.)

On February 6 and 7, 2008, Don Hosea ("Hosea"), the human resources manager for the Mast New York office, attempted to meet with Dollman to discuss her absences. (Defs. 56.1 Stmt. ¶ 26.) Dollman refused to meet with him. (Defs. 56.1 Stmt. ¶ 26.) On February 6, 2008, Dollman's attorney sent a letter to Hosea indicating that the severance package was unacceptable and raising questions about Dollman's termination with respect to her pregnancy

-5-

and immigration status. (Dollman Aff. Ex. F: Email from Preston A. Leschins to Don Hosea dated Feb. 6, 2008.) On February 8, 2008, Prentis decided to make Dollman's termination effective immediately. (Defs. 56.1 Stmt. ¶¶ 27-28.) Prentis avers that she was not aware of the letter from Dollman's attorney when she made that decision. (Defs. 56.1 Stmt. ¶¶ 27-28.)

After her termination, Dollman visited several internet job-posting websites and discovered that Mast was advertising for a Fabric and Trim Development Manager in its New York office. (Dollman Aff. Ex. D: Job Website Printouts dated Feb. 8, 2008 ("Job Postings") at Bates Nos. 0000156-0000167.) Dollman also found a listing for a Senior Material Research Designer, a Textile Technologist, and a Fabric Research Manager for Mast's New York office. (Job Postings at Bates Nos. 0000168-0000174.) On February 13, 2008, she filed a complaint with the New York State Division of Human Rights (the "SDHR"). (Complaint dated Oct. 23, 2008 ("Compl.") Ex. 1: N.Y. State Dept. of Human Rights Final Investigation Report and Basis of Determination in Case No. 10123650-08-E-SON-E dated Aug. 14, 2008 ("SDHR Report").)

In August 2008, the SDHR completed its investigation. According to the SDHR report, Dollman "was the only one of more than sixty employees in [] Victoria's Secret Direct Production" to be terminated as a result of the sleepwear restructuring. (Report at 6.) Further, the SDHR report noted that Mast hired a woman named Jennifer Lee to work as a Senior Technical Designer "a few weeks after [Dollman's] termination." (Report at 6-7.)

On November 24, 2008, Dollman and her husband commenced this action asserting claims for (1) national origin discrimination; (2) pregnancy discrimination; (3) retaliation; and (4) negligent infliction of emotional distress.

## DISCUSSION

### I. Legal Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Davis v. Blige, 505 F.3d 90, 97 (2d Cir. 2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has made an initial showing that there is no genuine issue of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita, 475 U.S. at 586-87). The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. Liberty Lobby, 477 U.S. at 255; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).

## II. National Origin Discrimination

Title VII prohibits employment discrimination on the basis of national origin "with respect to [an employee's] compensation, terms, conditions, or privileges of employment."[1] 42 U.S.C. § 2000e-2(a)(1); Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993). "The term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." Espinoza v. Farah Mfg. Co., 414 U.S. 86, 88 (1973). This case requires a threshold inquiry as to whether a "national origin" claim can arise from intra-country, regional discrimination—as applied here, where the alleged discriminator from Birmingham in west-central England targets a victim because she is from the county of Essex, northeast of London.

The text of Title VII does not address whether "regional" discrimination is within the ambit of "national origin" discrimination. The Equal Employment Opportunity Commission has issued guidelines "broadly" interpreting national origin to include ancestry, place of origin, and the cultural and linguistic characteristics of a national origin group. 29 C.F.R. § 1606. Further, courts have extended national origin protection to persons born in countries which no longer exist, Pejic v. Hughes Helicopters, Inc., 849 F.2d 667, 673-74 (9th Cir. 1988), and persons with non-sovereign ancestries (e.g. Acadians or "Cajuns"), Roach v. Dresser, 494 F. Supp. 215,

---

[1] Each of Dollman's federal claims are coupled with identical allegations under the New York Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 et seq. and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. Because the Court of Appeals "has determined that a plaintiff's discrimination claims under both the NYSHRL and the NYCHRL are subject to the burden-shifting analysis applied to discrimination claims under Title VII," Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010), and this case implicates none of the unique remedial provisions of the NYCHRL, the analysis of federal, state, and municipal law is combined.

-8-

217 (W.D. La 1980) ("Distinctions between citizens solely because of their ancestors are odious

to a free people whose institutions are founded upon the doctrine of equality, and we decline to

accept the argument that litigation of this sort should be governed by the principles of

sovereignty."); see also Janko v. Ill. State Toll Highway Auth., 704 F. Supp. 1531, 1532 (N.D.

Ill. 1989) ("This would include discrimination today by members of the majority against those

among us who are considered Gypsies.").

   Despite this inclusiveness, discrimination on the basis of a person's regional

heritage has typically been excluded from the coverage of "national origin." Some federal courts

have not recognized such discrimination, in and of itself, as a violation of the Civil Rights Act.

See Bronson v. Bd. of Educ. of the City Sch. Dist. of Cincinnati, 550 F. Supp. 941, 959 (W.D.

Ohio 1982) ("There is no indication that 'national origin' was intended to include Appalachians

or to include groups such as Appalachians who do not possess a national origin distinguishable

from that of other citizens of the United States."); see also De Volld v. Bailar, 568 F.2d 1162,

1164-65 (5th Cir. 1978) ("Put another way, whatever motives the Commission may have had in

choosing between two people of the same ethnic origin, discrimination cannot have been among

them."). But see Storey v. Burns Int'l Sec. Servs., 390 F.3d 760, 763-64 (3d Cir. 2004)

(declining to consider whether a "Confederate Southern-American" was protected for purposes

of national origin discrimination).

   Aside from the patchwork of caselaw declining to recognize or consider regional

discrimination claims, several other factors counsel against granting victims of regional

discrimination the same protection afforded those who suffer race or gender bias. Notably, the

legislative history of Title VII suggests that Congress drew a line which excluded regional

-9-

discrimination from national origin protection. As the Supreme Court noted in Espinoza, "[t]he

only direct definition given the phrase 'national origin' is the following remark made on the floor

of the House of Representatives by Congressman Roosevelt, Chairman of the House

Subcommittee which reported the bill: 'It means the country from which you or your forebears

came. . . . You may come from Poland, Czechoslovakia, England, France, or any other country.'"

Espinoza, 414 U.S. at 89 (citing 110 Cong. Rec. 2549 (1964)). Moreover, there is no clear

history of discriminatory animus, comparable to that faced by blacks or women or Italians

because of one's county (not country) of origin. See Griggs v. Duke Power Co., 401 U.S. 424,

429-30 (1971) ("The objective of Congress in the enactment of Title VII is plain from the

language of the statute. It was to achieve equality of employment opportunities and remove

barriers that have operated in the past to favor an identifiable group of white employees over

other employees."). Indeed, attempting to ferret out such discrimination would pose a near-

impossible task for a court or jury. Unlike the more easily identifiable traits of race or sex, full

appreciation of the subtle nuances of regional identity—a prerequisite to deciding a claim of

regional discrimination—requires an ethnographic immersion that could not be attained by

simply reviewing court filings, exhibits, expert testimony, or the like. Indeed, it is the nuance of

regional discrimination that sets it apart from the more detestable forms prohibited by law, which

arise from the reversion to superficial distinctions well understood as irrelevant to a person's

character.

               Finally, the infirmity of Dollman's legal claim is illuminated by her inability to

muster facts showing discrimination by Defendants on the basis of her regional or national

origin. The alleged discriminatory acts only amount to passive instructions to refrain from using

the word "bonkers" and opaque English humor.  See Duch v. Jakubek, 588 F.3d 757, 762 (2d

Cir. 2009) ("Specifically, a plaintiff must show that the misconduct was 'severe or pervasive

enough to create an objectively hostile or abusive work environment,' and the victim must also

subjectively perceive that environment to be abusive.").  These statements are so scattershot and

meek that they do not create a hostile environment.  See Alfano v. Costello, 294 F.3d 365, 373-

74 (2d Cir. 2002) ("As a general rule, incidents must be more than episodic; they must be

sufficiently continuous and concerted in order to be deemed pervasive.").  Moreover, they are

unconnected to any particular region of England because Tranter's admonitions would apply

equally to persons from Essex or Birmingham.

            Accordingly, because neither the undisputed facts nor the law support Dollman's

claims for national origin discrimination, those claims are dismissed.


III.  Pregnancy Discrimination

            Title VII was amended in 1978 by the Pregnancy Discrimination Act, 42 U.S.C. §

2000e(k), which provides that discrimination "on the basis of sex include[s] . . . [discrimination]

'on the basis of pregnancy' . . . [and] a woman affected by pregnancy shall be treated the same

for all employment-related purposes."  Title VII creates causes of action for pregnancy

discrimination for both a hostile work environment and wrongful termination.  See Leibovitz v.

N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001); Quartino v. Tiffany & Co., 71 F.3d

58, 64 (2d Cir. 1995).

A.  Hostile Work Environment

For hostile workplace harassment on account of one's pregnancy to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment." Leibovitz, 252 F.3d at 188 (citations omitted). "The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that she personally considered the environment hostile, and that the environment rose to some objective level of hostility." Leibovitz, 252 F.3d at 188 (citing Harris, 510 U.S. at 21.

Although Dollman apparently felt she was subject to hostility in the workplace, she fails to advance facts that would lead a reasonable jury to reach the same conclusion. Harris, 510 U.S. at 21 ("Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive-is beyond Title VII's purview."). Notably, she asserts only that Tranter's mother congratulated and hugged her and that she was not given time off for one of her many appointments. These two isolated occurrences lack both the "quantity and quality" of abuse that would lead a fact-finder to conclude that her workplace was polluted with hostility. See Torres v. Pisano, 116 F.3d 625, 631-32 (2d Cir. 1997) (noting that a reasonable person would find her working conditions altered when the supervisor repeatedly uses vulgarities towards her, uses crude sexual humor, ridicules one's pregnancy, or make comments on anatomy). Accordingly, Dollman's hostile environment claims premised on pregnancy discrimination are dismissed.

### B. Wrongful Termination

Dollman's wrongful termination claim is subject to the well-established burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981), and St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-08 (1993).

"First, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination." Quartino, 71 F.3d at 64. A plaintiff must show that (1) she was a member of the protected class (i.e. pregnant); (2) she satisfactorily performed the duties required by the position; (3) she was discharged; and (4) her position remained open and was ultimately filled by a non-pregnant individual or that the circumstances of her discharge give rise to an inference of unlawful discrimination. See Quartino, 71 F.3d at 64 (citing McDonnell Douglas, 411 U.S. at 802); see also Montana v. First Fed. Sav. & Loan Ass'n, 869 F.2d 100, 104 (2d Cir.1989) ("In short, we decline to apply the McDonnell Douglas standard inflexibly. . . . [A] discharged employee . . . need not show that he was replaced . . . it is sufficient that the discharge occur in circumstances giving rise to an inference of age discrimination.").

Second, where a plaintiff makes out a prima facie case, the burden of production shifts to the employer to articulate a legitimate, clear, specific and non-discriminatory reason for discharging the employee. Quartino, 71 F.3d at 64 (citing Gallo v. Prudential Res. Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)).

Finally, if the defendant articulates a non-discriminatory reason for its behavior, "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the

employment action." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) (citations omitted). At this stage, all presumptions drop from the analysis and the fact-finder simply decides "whether [by a preponderance of the evidence] the defendant intentionally discriminated" against the plaintiff on the basis of pregnancy. U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); see also Hicks, 509 U.S. at 510-12 ("If, on the other hand, the defendant has succeeded in carrying its burden of production, the McDonnell Douglas framework—with its presumptions and burdens—is no longer relevant."). Thus, burden shifting is not "intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." Aikens, 460 U.S. at 715 (quoting Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978)).

### 1. Dollman's Prima Facie Case

"The Supreme Court has used the adjective 'minimal' to describe the burden of establishing a prima facie case of discrimination . . . and [the Court of Appeals has] likewise held that the plaintiff's burden of establishing a prima facie [Title VII] case is de minimis." Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009) (citing Hicks, 509 U.S. at 509). Because it is undisputed that Dollman was pregnant and terminated, she need only show that she satisfactorily performed her job and that the circumstances of her termination create an inference of discrimination.

With regard to her job performance, although each of Dollman's reviews listed areas for improvement, her consistent scores of "meets expectations" or "exceeds expectations" show that she was a technically sound and successful manager. Notably, Tranter repeatedly

-14-

lauded her for excellent technical skills. Dollman's strong marks demonstrate that she was objectively performing well and satisfying Mast's internal subjective measures. Compare Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 92 (2d Cir. 2001) (employing objective test that "the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job'") with Thornley v. Penton Publ'g, Inc., 104 F.3d 26, 30 (2d Cir. 1997) (requiring subjective demonstration of "satisfactory job performance, in accordance with the particular employer's criteria").

Although Dollman does not specifically identify a non-pregnant replacement who filled her position, the circumstances of her termination raise an inference of unlawful discrimination. Principally, Dollman shows that Mast continued to advertise for her position after November 2007, when the decision to terminate her was made. Those advertisements continued even after her termination in January 2008. Although Defendants submit they had other motives to post these advertisements, the publication of them gives rise to an inference that "restructuring" was not the real or entire reason for Dollman's termination. Indeed, according to the SDHR investigation, Mast's "restructuring" resulted in the termination of Dollman and two others. Further, Dollman submitted Hosea's work calendar for the weeks following her termination. An entry on February 21, 2008 shows Hosea scheduled a meeting titled "Updated: Exploratory Interview with Elaine Stewart – Fabric Mgr Talent (1740 Broadway – Your Office)." Cumulatively, these facts establish a prima facie case.

### 2.  Defendants' Non-Discriminatory Justifications

"To dispel the inference of discrimination arising from the establishment of a
prima facie case, [a defendant] is required to articulate—but not prove—a legitimate,
nondiscriminatory reason for the discharge." Dister v. Cont'l Grp., Inc, 859 F.2d 1108, 1115 (2d
Cir. 1988) (citations omitted).  Thus, a defendant's burden of production "is not a demanding
one."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 446 (2d Cir. 1999).  Moreover, "although the
burden of production shifts to the defendant, the ultimate burden of persuasion remains always
with the plaintiff."  Bickerstaff, 196 F.3d at 446 (citing Hicks, 509 U.S. at 507).

Defendants proffer that the restructuring of the division in which Dollman worked
caused her termination.  When faced with the need to downsize from three Fabric Managers to
two, Prentis endeavored to select the two best performers for continued employment.  Prentis
conducted a review of each manager and determined that Dollman had the least desirable
qualities, especially with regard to her interpersonal skills.  This finding was supported in
Dollman's prior performance reviews, which cited managerial skills as her primary deficiency.
Because the "inability to cooperate with colleagues constitute[s] [a] legitimate, non-
discriminatory reasons for discharge," Byong v. SL Green Realty Corp., No. 05 Civ. 305 (WHP),
2007 WL 831740, at *6 (S.D.N.Y. Mar. 20, 2007) (citing Meiri v. Dacon, 759 F.2d 989, 997 (2d
Cir. 1985)), Defendants set forth a legitimate non-discriminatory justification.

### 3.  Evidence of Pretext

At the final McDonnell Douglas stage, the inquiry turns to whether the plaintiff
could show, by a preponderance of the evidence, that the defendant intentionally discriminated
against her.  See Hicks, 509 U.S at 511; Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708,

-16-

714 (2d Cir. 1996). This inquiry is often framed as whether a plaintiff could present evidence sufficient to show the defendant's proffered reason for the termination was pretextual. See LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995).

Dollman elicits several facts which could lead a reasonable jury to conclude that her firing was pretextual. Primarily, a jury could reject Defendants' proffered restructuring justification. This finding would not be unwarranted, given the small number of employees Mast terminated and the ongoing advertising for Dollman's position. Given Dollman's consistently positive job evaluations, there are significant questions of fact about why Dollman was selected for termination over the two Fabric Managers who remained. Although Defendants argue that Plaintiff is misinterpreting the advertisements placed online, that fact issue, along with the other inconsistent evidence about the circumstances of Dollman's termination, are appropriately resolved by a jury.

Accordingly, Defendants' motion for summary judgment on Dollman's pregnancy discrimination claim with respect to her termination is denied.


IV. Retaliation

Dollman asserts a retaliation claim based on Mast's decision to accelerate her termination. Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Because retaliation claims are subject to the

-17-

McDonnell Douglas framework, Dollman must first make a prima facie showing that she engaged in protected activity and that there was a causal connection between the protected activity and the adverse employment action. See Mack v. Otis Elevator Co., 326 F.3d 116, 129 (2d Cir. 2003); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

Dollman fails to establish a prima facie case of retaliation in several respects. First, Dollman only engaged in protected activity—by consulting an attorney—after she had been given notice of her termination. Thus, there is no causal relationship between her objection to Mast's behavior and Mast's decision to terminate her—the deed had been done. Moreover, because "[t]he anti-retaliation law 'protects an individual not from all retaliation, but from retaliation that produces an injury or harm,'" Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)), the decision to accelerate Dollman's termination, while offering the same severance package, does not constitute an adverse employment action. Finally, even if the acceleration of her termination could constitute an adverse employment action, Dollman elicited no evidence showing that Prentis, who was responsible for the termination, knew Dollman had sought the advice of counsel. Rather, Prentis's decision was based on Dollman's frequent absences from work in the first week of February 2008—a fact Dollman fails to rebut. Accordingly, Dollman's retaliation claims are dismissed.

-18-

V. Emotional Distress Claims

           Dollman and her husband Trevor Dollman also bring state law claims for negligent infliction of emotional distress arising from Dollman's termination and subsequent loss of a United States work visa. Under New York law, a claim for negligent infliction of emotional distress may arise under either (1) the "bystander theory" or (2) the "direct duty theory." Baker v. Dorfman, 239 F.3d 415, 421 (2d Cir. 2000). But these theories depend on a plaintiff's proximity to and observation of "serious physical injury or death inflicted . . . on a member of the plaintiff's immediate family" or the endangerment of a plaintiff's physical safety. Baker, 239 F.3d at 421. Neither applies here. "However, New York also recognizes a cause of action in cases where there is "an especial likelihood of genuine and serious mental distress, arising from . . . special circumstances, which serves as a guarantee that the claim is not spurious." Baker, 239 F.3d at 421 (quoting Johnson v. State, 334 N.E.2d 590 (N.Y. 1975)). Courts have therefore recognized causes of action when a plaintiff is mistakenly informed about the death of a family member or told that he has a serious illness when he, in fact, does not. See Baker, 239 F.3d 421-22 (citations omitted).

           Such special circumstances of serious distress are not present here. Learning that you or your spouse was terminated by an employer—a common occurrence in this economy—is not sufficient to support a claim for negligent infliction of emotional distress. See Kelly v. Chase Manhattan Bank, 717 F. Supp. 227, 235 (S.D.N.Y. 1989) (dismissing claim by discharged bank employee and noting while "termination of an employee is likely to give rise to bad feelings and anxiety . . . [t]his cannot mean that every adverse employment decision may give rise to a claim

of negligent infliction of emotional distress"). Accordingly, Plaintiffs' claims for negligent infliction of emotional distress are dismissed.

## VI. Proper Defendants

Finally, Defendants challenge the propriety of the Dollmans' suit against three different entities—Limited, Mast, and Victoria's Secret. Defendants assert that Mast, the company that employed Dollman, is the only appropriate defendant. Limited is a holding company with no employees. While Dollman was hired originally by Victoria's Secret, the gravamen of her case concerns only her employment at Mast. Dollman's tax returns also that Mast, and not any other Defendant, was her employer. Because there is no obvious need to pierce the corporate veil and Dollman's allegations concern Mast exclusively, Defendants Limited and Victoria's Secret are dismissed as Defendants from this action.

## CONCLUSION

For the foregoing reasons, Defendants Limited Brands, Inc. and Victoria's Secret

Direct, LLC are dismissed from this action. All claims by Plaintiff Trevor Dollman are also

dismissed. Defendant Mast Industries, Inc.'s motion for summary judgment on Plaintiff Clair

Dollman's claim for wrongful termination based on pregnancy discrimination is denied.

Defendant Mast Industry Inc.'s motion for summary judgment on all remaining claims is

granted. The Clerk of Court is directed to terminate all pending motions.

Dated: August 17, 2010
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of record:*

Preston Avram Leschins, Esq.
Anzalone & Leschins
888 Seventh Avenue, Suite 3008
New York, NY 10106
*Counsel for Plaintiffs*

Andrew Christian Smith, Esq.
Vorys, Sater, Seymour & Pease, LLP
52 East Gay Street
P.O. Box 1008
Columbus, OH 43216
*Counsel for Defendants*

-21-

Angela Kathleen Dorn, Esq.
Gonzalez Saggio & Harlan
350 Fifth Avenue
59th Floor
New York, NY 10118
*Counsel for Defendants*